## HERMAN MANFORD FIX, JR. *v.* STATE OF MARYLAND

[No. 172, September Term, 1968.]

704

*Decided January 22, 1969.*

The cause was argued before MURPHY, C.J., and ANDER-SON, MORTON, ORTH, and THOMPSON, JJ.

*E. Harrison Stone* for appellant.

*Bernard L. Silbert, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County, L. Robert Evans, Deputy State's Attorney for Baltimore County,* and *Robert A. DiCicco, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

William H. Trescott, Jr., was murdered on 4 February 1965. The appellant was accused of committing the crime and on 15 May 1967 three indictments were returned against him by the Grand Jury for Baltimore County. Indictment No. 32363 charged him with murder in the first degree (1st count), murder in the second degree (2nd count), manslaughter (3rd count), and assault and battery (4th count). Indictments Nos. 32364 and 32365 related to carrying concealed weapons. The case came on for trial on 27 March 1968 in the Circuit Court for Baltimore County. The appellant pleaded guilty to murder in the second degree charged in the second count of indictment No. 32363.[1] The appellant was examined by the court

---

1. Md. Rule 724 provides: "A defendant may enter a plea of not guilty to one degree and a plea of guilty to another degree of an

with respect to the plea, his counsel and the Deputy State's Attorney were heard thereon, an agreed statement of facts was presented to the court and the appellant testified. The docket entries read: "Traverser submits under plea of guilty to the second count of the indictment (murder in the second degree). * * * Case submitted on statement of facts. * * * Verdict: guilty to the second count as confessed (guilty of murder in the second degree)." The appellant was sentenced to 18 years to run consecutively with a sentence to be served which was imposed in Virginia.[2] Stets were entered to the 1st, 3rd and 4th counts of indictment No. 32363 and to indictments Nos. 32364 and 32365 as authorized by Md. Rule 718.

The appellant appealed. He attacks his plea of guilty and claims that he was denied a speedy trial. But if the plea of guilty was freely and intelligently made, the right to a speedy trial, if such was denied the appellant, was waived thereby as such a plea is a conviction of the highest order and waives all procedural objections, constitutional or otherwise, and non-jurisdictional defects. *Ogle v. Warden,* 236 Md. 425. Even constitutional rights may be so waived, including that to a speedy trial. *Cohen v. State,* 235 Md. 62, *certiorari denied,* 379 U. S. 844; *Goetzke v. Warden,* 1 Md. App. 3. A plea of guilty will not be reviewed on appeal if it is properly entered; properly entered has been said to mean that the plea has been made freely,

---

offense, which, by law, may be divided into degrees of guilt." Md. Code, Art. 27, § 412 provides, in relevant part: "And the jury before whom any person indicted for murder shall be tried shall if they find such person guilty thereof ascertain in their verdict whether it be murder in the first or second degree; but if such person be convicted by confession, the court shall proceed, by examination of witnesses, to determine the degree of the crime, and to give sentence accordingly." It appears that both the procedure authorized by the rule and that prescribed by the statute were in substance followed here.

2. Eighteen years was the maximum sentence authorized for second degree murder by Md. Code, Art. 27, § 414 in effect at the time of the commission of the crime. Ch. 339, § 1, Acts 1966 increased the maximum sentence to 30 years but by § 2 thereof it does not apply to convictions for murders committed before 1 June 1966.

voluntarily and with full understanding of its nature and effect and of the facts upon which it is founded. *Lowe v. State,* 111 Md. 1. See *State v. Darling,* 130 Md. 251. So the Court of Appeals said in *Cohen v. State, supra,* at 69: "Maryland has long recognized that when a person pleads guilty, the judgment entered on the plea cannot ordinarily be reviewed on appeal if the plea was made freely and voluntarily with full understanding of its nature and effect, and the judgment properly entered." But there may be an appellate review to determine if the voluntary nature of a plea of guilty was clearly established prior to the lower court's acceptance of it and if it was unconditional. *Wayne v. State,* 4 Md. App. 424.

The appellant argues that his plea of guilty was involuntary "in that it was induced by prior erroneous rulings by the trial court relative to crucial evidentiary matters." He urges that the judge below [3] erred in denying, upon hearing prior to trial, his motion to suppress all testimony with respect to weapons seized from him at the time of his arrest and to suppress an oral confession made by him. He asserts that because of these alleged erroneous rulings he had "to decide between standing firm on his constitutional rights, which he feels were violated, or entering into an arrangement with the State whereby he could receive a maximum sentence of eighteen years." He maintains that "in a society which presupposes innocence, the accused should not have to make such a choice."

The contention of the appellant must fail because the record is devoid of any evidence to support his allegation that he pleaded guilty because of the rulings on his motions. Even if we would find that the rulings were erroneous as he claims, we could not, on the record before us, determine that the guilty plea was induced or compelled by the rulings or that he, in fact, made the choice for the reason he now asserts he was obliged to make it. On the contrary the record on its face clearly established, we think, that the plea was made freely and voluntarily with full understanding of its nature and effect, that it was un-

---

**3.** The judge presiding at the hearing on the motions to suppress disqualified himself from presiding at the trial. The guilty plea was accepted by another judge.

conditional and that the judgment was properly entered. In the circumstances we cannot assume, as the appellant asks us to do, that the plea was otherwise made.

When the case came up for trial the court elicited from the appellant that he was 26 years of age, had been graduated from high school and had completed a year of "electronics school." The court related to him the charges in the four counts of the murder indictment, ascertained from him that he was represented by the two attorneys then present, William F. Mosner and J. Earle Plumhoff, and asked if he was ready to plead. The transcript of the proceedings then reads:

> "MR. MOSNER: Your Honor, we wish to plead only to the second count, and that would be a plea of guilty.
>
> THE COURT: Is that acceptable to the State?
>
> MR. EVANS: Yes, sir. If the Court accepts that plea the State will stet Counts 1, 3, and 4 of that indictment and all counts of Indictments 32364 and 32365.
>
> THE COURT: Have you made your client aware of the significance of a plea of guilty, Mr. Mosner?
>
> MR. MOSNER: Yes, your Honor, we have. We have advised our client that in our opinion he cannot be sentenced under the present provisions of the law, but, would be sentenced under the provisions that applied at the time of this offense, which would be a maximum sentence of eighteen years under the plea of guilty to murder in the second degree. * * *
>
> THE COURT: * * *. Do you understand what a plea of guilty means, Mr. Fix?
>
> HERMAN M. FIX, JR: Yes, sir, your Honor, I do.
>
> THE COURT: Did anybody make you any promises, or threats, or deals to persuade you to plead guilty?
>
> HERMAN M. FIX, JR: No, sir, they did not.
>
> THE COURT: Do you realize that without further ado I can forthwith impose a sentence up to eighteen years?

HERMAN M. FIX, JR: Yes, sir, I do.

THE COURT: You're now in the County Jail?

HERMAN M. FIX, JR: Yes, sir, I am.

THE COURT: How long have you been there?

HERMAN M. FIX, JR: I've been incarcerated since October 2, 1967.

THE COURT: Approximately when were — were you appointed, Mr. Mosner?

MR. MOSNER: Yes, your Honor.

THE COURT: Approximately when were you two gentlemen appointed?

MR. MOSNER: Very shortly after that, your Honor, Judge Jenifer appointed us.

MR. PLUMHOFF: October 6th I have.

THE COURT: Have you had ample time to thresh all this out with your client?

MR. MOSNER: Your Honor, I believe we have. We have had pretrial motions heard by Judge Turnbull and ruled on, we have discussed the case time and again with Mr. Fix. I feel that he is an intelligent person who fully understands the significance of the plea and I do feel that it is made of his own volition.

THE COURT: It's true it's a free and voluntary plea on your part, Mr. Fix?

HERMAN M. FIX, JR: Yes, sir, it is.

THE COURT: Are you satisfied with your court-appointed counsel?

HERMAN M. FIX, JR: Yes, sir, I am.

THE COURT: All right, be seated. Tell me what this case—how did it develop?

MR. EVANS: (Deputy State's Attorney) Well, first of all, before we get into that, your Honor, I don't want to—I want the record clearly to show that this is a matter of plea bargaining as approved by the American Bar Association. Now, when Fix has said that nobody has made any deals, the fact of the matter is that the State has agreed with defense counsel that in the event of

a plea on the second count the State will stet the balance of these counts. This seems fairly obvious from the activity here this morning.

THE COURT : Certainly.

MR. EVANS : And I find nothing wrong with it, but I don't want the record to—

THE COURT : I don't either. As long as it's free and voluntary on this one count, and that's all I'm concerned with, provided, of course, the gentleman has had competent advice from competent lawyers, and I'm persuaded that he's gotten that, certainly in this case. I have a high regard, of course, for both counsel. What are the facts?"

The facts of the crime were then related by the State. The deceased, a manager of a package goods liquor store, was shot in the back and chest by the appellant during the course of a robbery and subsequently died. The appellant was apprehended five days later in Virginia. He had held up a filling station outside of Norfolk, Virginia, fled in an automobile, was pursued by the police and captured. A .22 caliber pistol, proved to be the murder weapon by ballistics comparison with the bullet extracted from the body of the victim, and a P-38 German Army pistol identified as having been stolen from the deceased and bullets for it were seized from him. He had pistol whipped the victim of the Virginia robbery but had not killed him. The appellant testified. He said his father retired from the United States Army with the rank of major and lived with his mother in Florida. An elder brother, employed by a railroad, lived in Miami. Another brother, a medical doctor, lived in Georgia as did a sister who was married to an electronics engineer. He was graduated from Crisp County High School in Cordele, Georgia in 1960. He was in the navy for 4 years and 1 month, 3 years on an aircraft carrier and one year in electronics training school. He was discharged in September 1964. He obtained employment with Minneapolis Honeywell Electronics Corporation "because of my electronics background and I already had a top security classification from the United States Government." He worked 3 or 4 months and was released when "they

cut the employment down." His goal was to be with a law enforcement agency and he applied for such a position in Florida but was not accepted because of defective eyesight. He went to Washington, D. C. seeking employment and applied for a treasury job through civil service. He assumed the application was still being processed. He also applied for a job with the C. & P. Telephone Company but was not accepted because he then weighed 270 pounds (at the time of trial he weighed 200 pounds). Asked why he got involved in the robberies he said:

> "I guess, with all sincerity, I'd have to say I was both financially and emotionally unstable at the time, you know, I was depressed, and it was foolish and, of course, I realize that, but, it's hardly any excuse or any justification for the crime, but, that was primarily the reason, I would say, in that particular time."

He denied that he went into the liquor store in Baltimore County with the intention of doing anyone bodily harm:

> "No. Actually, I was pretty frightened, and I went into the store, and I did try to rob the man of what was in the register at the time, and he run to the door, told me nobody was leaving. First he picked a revolver up and I took the revolver and stuck it in my coat pocket so there wouldn't be any trouble. Then he run to the door. * * * He spread his arms so I couldn't get out of the door, said no one was leaving, and I said, well, if that's the way it is, I'm going to leave, just get out before there's any trouble, and I put my arms around, you know, to try to move him, and when I did, well, we begin to scuffle, and my arm hit the binder for the door, you know, and that was the one had the pistol in it, and the pistol went off, and, as he started to slump I picked him up and, you know, tried to carry him and the gun went off again; it was too late then."

He told about the Virginia robbery—he went into the filling station, asked the man for his money, hit him lightly at the nape of the neck and left the scene. He received a sentence of

19 years for that crime. He said he got the .22 caliber pistol, a Beretta, while overseas in the navy. The German pistol was the "property of the man robbed in Baltimore County." Asked if anything happened in the navy "that would have influenced you with regard to taking up robbery within a short while after you got out," he said:

> "No, not necessarily. Of course, you meet all types of people in the service, no different from anywhere else, except that they are, you know, the majority are male, of course, and being on shipboard you hear one thing and another, but, I don't think it made me—it might have been something that would, related me back to thinking the way I did, but, I couldn't pinpoint it.

Asked if he had ever received psychiatric treatment, he replied:

> "Well, I've done some studies myself in psychology and psychiatry, and Dr. Harry Brick from the Virginia State Penitentiary is a neuropsychiatrist and I've studied through him also—he's deceased at this time—but, they have, as far as evaluation, they evaluate you when you go in."

He was evaluated mentally competent by the Virginia authorities.

It is true that when the appellant came up for trial he had a choice. He could plead not guilty and go to trial faced with the possibility that he would be convicted of murder in the first degree with the resultant consequences [4] or he could plead guilty to the lesser crime of murder in the second degree, which apparently the State had indicated it would not oppose, with the hope that the court would accept such a plea, thus limiting his sentence to a maximum of 18 years. He selected the latter. That the State indicated it would stet the remaining charges, if the court consented, did not make his plea conditional or involuntary. He was represented by highly competent and experi-

---

4. In the penalty stage of the proceedings the court noted, "If this case were submitted to the court on the facts that have been announced it would seem crystal clear that what this really is is a first degree murder case which would call for a life sentence."

enced counsel who advised him of the nature and effect of the plea. We believe it apparent that he had a full understanding of its nature and effect and of the facts upon which it was founded. Upon inquiry he told the court he understood what a plea of guilty meant and stated that no one made him any promises or threats or deals which persuaded him to plead guilty. He did not dispute the statement made by his counsel to the court that "we have discussed the case time and time again with Mr. Fix. I feel that he is an intelligent person who fully understands the significance of the plea and I do feel that it is made of his own volition." When asked by the court immediately following this statement by his counsel whether it was true that "it's a free and voluntary plea on your part, Mr. Fix?" he said, "Yes, sir, it is," and that he was satisfied with his counsel. Considering the appellant's statements to the court, the remarks of his counsel and the totality of the evidence before the court, we cannot say that the guilty plea was other than freely and understandingly made. The appellant had the opportunity to consider the rulings which he now challenges and claims induced his plea for almost a month and a half before he pleaded guilty. He cannot now, in the circumstances extant on the record before us, effectively claim they rendered his plea involuntary. We find no error in the acceptance of the guilty plea by the lower court.

As we have found that the plea of guilty was properly accepted, the appellant is deemed to have waived the right to a speedy trial (if such was denied him). And, of course, error in the denial of the motions to suppress the evidence (if error there was) is meaningless since the guilty plea made unnecessary a trial or production of evidence to support the indictment. *Gopshes v. State*, 1 Md. App. 396.[5]

*Judgment affirmed.*

---

5. The .22 caliber pistol and the P-38 pistol were seized from the appellant when he was arrested in Virginia. The appellant moved that the weapons be produced for inspection and that they be suppressed as obtained by an unreasonable search and seizure. The State disclosed that the weapons had been destroyed by the Virginia authorities after the appellant's conviction in that State. The appellant moved to suppress all testimony with regard to the weapons.